IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CRIMINAL NO. 4:15-CR-298 |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| **WYATT ROBERT YANNEY (1),** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Defendant Wyatt Robert Yanney, through appointed counsel, moves for compassionate release and reduction of sentence under 18 U.S.C. § 3582(c)(1)(A)(i). (Doc. 68). Yanney asks the court to reduce his sentence to time served based on his medical condition and his concern that the COVID-19 virus[1] may reach the low-security facility at Allenwood Federal Correctional Institution ("FCI Allenwood Low"), where he is currently incarcerated. The government opposes compassion release in this case. For the reasons that follow, we will deny Yanney's motion.

**I.    Factual Background & Procedural History**

In December 2015, the grand jury returned a three-count indictment charging Yanney with possessing with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 1), possession of firearms in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count

---

[1] The COVID-19 virus is also known as "severe acute respiratory syndrome coronavirus 2" and "SARS-CoV-2." *Naming the coronavirus disease (COVID-19) and the virus that causes it,* WORLD HEALTH ORGANIZATION, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it. We refer to the virus herein as "the COVID-19 virus" and to the disease it causes as "COVID-19."

2), and possession of firearms by a prohibited person in violation of 18 U.S.C. § 922(g)(3) and § 924(a)(2) (Count 3). (Doc. 1 at 2-6). The indictment also included a forfeiture allegation. (Id. at 7-9). On April 18, 2016, Yanney pled guilty to Counts 1 and 2. (See Doc. 27). The written plea agreement included a joint recommendation that the readily provable amount of alpha-pyrrolidinopentiophenone ("Alpha-PVP" or "A-PVP")[2] attributable to Yanney was 1500 grams. (See Doc. 17 ¶ 12). Yanney also agreed to forfeit the approximately $900 in cash and six firearms identified in the indictment's forfeiture allegation. (See Docs. 29-30).

The facts underlying Yanney's convictions and sentence are these. An investigation into distribution of Alpha-PVP in Bradford County, Pennsylvania, led authorities to Yanney, who was importing the drug from China. (See Doc. 38 ¶ 6). In August 2015, law enforcement agents learned that Yanney had ordered a large quantity of Alpha-PVP from a source in China. (Id. ¶ 7). Those agents consulted with the United States Postal Service and learned that a package addressed to a "Jim Quick" had been shipped from China on August 7, 2015, and was bound for 216 Wheelock Avenue, Athens, Pennsylvania. (See id. ¶¶ 7-8). The package was intercepted and the drugs were mostly replaced with a counterfeit powder. (See id. ¶ 8). The package was placed on the porch of the Wheelock Avenue address, and agents observed Yanney arrive by vehicle and take possession of it. (Id.) Yanney

---

[2] As explained in the presentence report, Alpha-PVP is known by the street names of "flakka" and "gravel." (Doc. 38 ¶ 6). It is "a synthetic stimulant that was originally synthesized in the 1960s that is related to the cathinone ('bath salt') class of drugs." (Id.)

drove a short distance and pulled over to examine the package, at which point the agents arrested him. (Id.)

In a postarrest interview, Yanney admitted that he ordered the drugs over the internet and that he paid $1,200 through Western Union for the supply. (Id. ¶ 9). He also admitted that this was not his first purchase: he told agents that he had ordered the same quantity one month earlier, and that he had sold those drugs throughout Pennsylvania and New York. (Id.) Yanney reported that he could make up to $15,000 from a 500-gram supply. (Id.) He described the efforts that he took to avoid getting caught, which included using a burner phone and fictitious names and email addresses. (Id.) He also confessed to having more drugs as well as firearms in his home. (Id.) Agents then searched Yanney's home and found cocaine, heroin, "Molly," $1,000 in cash, drug paraphernalia, a digital scale, and five firearms: a loaded .40 caliber handgun, a .45 caliber handgun, a .22 caliber handgun, a .50 caliber rifle, and a 12-gauge shotgun. (Id. ¶ 10).

The presentence report calculated an offense level of 21, a criminal history category of I, and a Guidelines imprisonment range of 37 to 46 months on Count 1. (Doc. 38 ¶ 55). The Guidelines sentence on Count 2 was the statutory consecutive mandatory minimum term of 5 years' imprisonment, resulting in a total Guidelines range for both counts of 97 to 106 months. (Id. ¶ 54). The court departed and varied downward, imposing a one-day term of imprisonment on Count 1 and a 5-year consecutive mandatory minimum term on Count 2. (See Doc. 63). Yanney voluntarily surrendered to the Attorney General on May 24, 2017. (See Doc. 64). He is currently housed at FCI Allenwood Low, with a projected release date of August

25, 2021.  See *Find an Inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/ inmateloc/ (search for BOP Register Number "74051-067") (last visited July 2, 2020).

On April 8, 2020, Yanney wrote to the warden at FCI Allenwood Low and asked the warden to consider releasing him to home confinement or moving the court for compassionate release.  (Doc. 70-2 at 1-2).  The warden denied Yanney's request on April 10, 2020.  (Id. at 3).  Yanney subsequently filed a *pro se* motion for compassionate release with this court.  (Doc. 68).  That same day, we appointed the Federal Public Defender to determine whether Yanney may be eligible for such relief and, if so, to file any appropriate motion or briefing on his behalf.  (See Doc. 69).  Appointed counsel filed a supporting brief on June 23, 2020, (Doc. 70), and we promptly implemented an expedited briefing schedule, (Doc. 71).  Yanney's motion is now fully briefed and ripe for review.  (Docs. 70, 75, 76).

## II.     Discussion

Yanney asks the court to reduce his sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as modified by the First Step Act of 2018, § 603(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239.  Section 3582(c)(1)(A)(i) allows the sentencing court to reduce a term of imprisonment if the court finds, after consideration of the Section 3553(a) factors, that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i).

Both the defendant and the Director of the Bureau of Prisons ("BOP") can move for compassionate release under Section 3582(c)(1)(A).  See id. § 3582(c)(1)(A).  But before a defendant can move the court directly, he must either "fully exhaust[]

4

all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf" or wait for 30 days to lapse from the warden's receipt of a request that the BOP file such a motion.  Id.  The warden denied Yanney's request to bring a motion on his behalf within the 30-day period, and we have no indication that this denial has been fully exhausted.  (See generally Doc. 70 at 2; Doc. 70-2 at 1-3; Doc. 75 at 4-5).  Nevertheless, the government takes the position that Yanney has satisfied the minimum statutory exhaustion requirements.[3]  (Doc. 75 at 5).  We therefore turn to the merits of Yanney's motion.

### A. Extraordinary and Compelling Reasons

Yanney contends that his medical condition and vulnerability to serious complications from COVID-19 combine to establish extraordinary and compelling reasons to grant compassionate release.  Yanney has been diagnosed with elevated blood pressure and hypertension; he has struggled with obesity; and he has a history of asthma, hypothyroidism, and irritable bowel syndrome.  (See Doc. 70 at 1, 4; see generally Doc. 73).  Yanney asserts that his hypertension and asthma place

---

[3] We note our disagreement with the government's legal conclusion that Yanney has satisfied the minimum statutory exhaustion requirements.  We have previously held that, should the warden respond to a request to bring a motion for compassionate release on a prisoner's behalf within the 30-day timeframe provided by 18 U.S.C. § 3582(c)(1)(A)—thus not allowing 30 days to "lapse" without action— the prisoner "must fully exhaust the warden's denial within the BOP before the court can entertain his motion."  See United States v. Petrossi, No. 1:17-CR-192, Doc. 133 at 2 & n.1 (M.D. Pa. Apr. 28, 2020) (collecting cases).  Nonetheless, the government may waive the defense of statutory exhaustion by explicitly conceding it, even if that concession is based on "a flawed legal conclusion."  See Sharrieff v. Cathel, 574 F.3d 225, 229 (3d Cir. 2009).  In light of the government's explicit concession on exhaustion, (see Doc. 75 at 5), we conclude that the government has waived exhaustion in Yanney's case.

5

him at "high risk for severe illness or death from COVID-19," that this risk is amplified in the prison setting, and that immediate release is the only way to guard against this risk and protect his health. (Doc. 70 at 1-2).

Congress delegated responsibility for defining "extraordinary and compelling reasons" for compassionate release to the United States Sentencing Commission. See 28 U.S.C. § 994(t). In Application Note 1 to Section 1B1.13 of the United States Sentencing Guidelines, the Commission identifies criteria for determining eligibility for a sentence reduction.[4] See U.S.S.G. § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018). Eligible circumstances include terminal illness as well as "a serious physical or medical condition" or "deteriorating physical or mental health because of the aging process" if the impairment "substantially diminishes" the ability to provide self-care within a correctional facility and is one from which the defendant "is not expected to recover." Id. at cmt. n.1(A)(i), (A)(ii)(I), (A)(ii)(III). A defendant may also be eligible for an age-based reduction if he is 65 or older, is experiencing "serious deterioration in physical or mental health because of the aging process," and has served the lesser of 10 years or 75 percent of his term of imprisonment. Id. at cmt. n.1(B). The Application Note closes with a catchall, authorizing a reduction when the Director of the BOP identifies in a

---

[4] We recognize that this policy statement has not been amended since passage of the First Step Act. See United States v. Kelly, No. 3:13-CR-59, 2020 WL 2104241, at *7 (S.D. Miss. May 1, 2020) (quoting United States v. Perdigao, No. 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020)). We agree with those courts to observe that Section 1B1.13 still "provides helpful guidance" even if it is no longer controlling. Id. (quoting United States v. Beck, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019)).

particular case "an extraordinary or compelling reason other than, or in combination with," the above.  Id. at cmt. n.1(D).

The BOP has also developed internal criteria for addressing prisoner requests for compassionate release.  Of the many considerations identified in the BOP's policy statement, the only criteria potentially applicable to Yanney are those concerning prisoners with a "debilitated medical condition."  See FED. BUREAU OF PRISONS, PROGRAM STATEMENT 5050.50: COMPASSIONATE RELEASE/REDUCTION IN SENTENCE: PROCEDURES FOR IMPLEMENTATION OF 18 U.S.C. §§ 3582 AND 4205(G) at 5, https://www.bop.gov/policy/progstat/5050_050_EN.pdf (Jan. 17, 2019).  The statement provides that compassionate release should be considered for prisoners "who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover."  Id.  Specifically, the BOP will consider compassionate release if a prisoner is "[c]ompletely disabled, meaning the [prisoner] cannot carry on any self-care and is totally confined to a bed or chair; or [c]apable of only limited self-care and is confined to a bed or chair more than 50% of waking hours."  Id.

Of course, neither the Sentencing Commission nor the BOP contemplated a deadly global pandemic when crafting these criteria.  Fortunately, the Third Circuit Court of Appeals had an early opportunity to provide guidance to district courts facing an inrush of compassionate release motions.  In United States v. Raia, 954 F.3d 594 (3d Cir. 2020), issued on April 2, 2020, the court observed that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison . . . cannot independently justify compassionate release, especially

7

considering BOP's statutory role and its extensive and professional efforts to curtail the virus's spread." United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020).[5] Over the past few months, district courts in both the pretrial and civil detention contexts likewise have opined that a generalized fear of the virus reaching a given institution is not a proper basis for release. See Ndir v. Doll, No. 1:20-CV-705, ___ F. Supp. 3d ___, 2020 WL 2306761, at *5 (M.D. Pa. May 8, 2020) (Conner, C.J.) (collecting cases in civil immigration detainee context); D.M. v. Barr, No. 20-4031, 2020 WL 1969893, at *5 (D.N.J. Apr. 24, 2020) (same); United States v. Anderson, No. 1:19-CR-239, 2020 WL 1953612, at *4, 5 (M.D. Pa. Apr. 23, 2020) (same in pretrial detention context). In other words, something more than a generalized concern regarding COVID-19 is required.

Yanney asserts that his medical conditions supply the requisite "something more." The Centers for Disease Control and Prevention ("CDC") recently updated their guidance concerning who is at unique risk for severe illness from COVID-19, and that guidance does implicate certain of Yanney's diagnoses. See *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed June 25, 2020).

---

[5] The Third Circuit in Raia held that motions under Section 3582(c)(1)(A) cannot be brought directly in the court of appeals and that the defendant's failure to exhaust administrative remedies would render remand futile. See Raia, 954 F.3d at 596-97. Anything the court said about the merits of the motion, after its threshold jurisdictional determination, is arguably *dicta*. We are nonetheless persuaded by and agree with the court's observations as to the availability of compassionate release during the COVID-19 pandemic.

Specifically, the guidance states that obese individuals (defined as anyone with a body mass index of 30 or above) "are at increased risk" from severe illness, and individuals with asthma and hypertension "might be at increased risk." Id. But Raia suggests that this increased risk, absent any likelihood of direct exposure to the virus, is not enough. Francis Raia was 68 years old and had Type 2 diabetes and heart issues, both of which appeared on the CDC's increased-risk list. See Raia, 954 F.3d at 596. The Third Circuit acknowledged "the risks that COVID-19 poses in the federal prison system, *particularly for inmates like Raia*," but nonetheless concluded that the "possibility" of the virus reaching his institution could not justify compassionate release. Id. at 597 (emphasis added).

Yanney's circumstances are substantially similar to Raia's. Yanney's counsel asserts that there has been an "explosion of COVID-19 cases in prisons across the country" and that 86 prisoners have died after contracting the disease in BOP custody. (Doc. 70 at 4). Tragically, counsel is correct—BOP statistics establish that several federal prisons have experienced outbreaks and that 90 prisoner deaths have been recorded to date. See *COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (select "Full breakdown and additional details") (last updated July 1, 2020, 3:00 p.m.). But nationwide figures are not representative of circumstances at individual prisons. As of this writing, no prisoner or staff

member has tested positive for the COVID-19 virus at FCI Allenwood Low.[6] See *COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (select "Full breakdown and additional details") (last updated July 1, 2020, 3:00 p.m.). And this is not for want of testing: 28 of 1085 prisoners at FCI Allenwood Low have been tested for the virus. See id. (select "Learn more about the data and view individual facility stats"); *Population Statistics*, FED. BUREAU OF PRISONS, https://www.bop.gov/mobile/about/population_statistics.jsp (last visited July 2, 2020). We thus have no objective basis to find that Yanney is at imminent risk of being exposed to or contracting the COVID-19 virus.

Moreover, the BOP has implemented extensive efforts to prevent future outbreaks. It has suspended most visitation, implemented screening measures for staff and prisoners, and limited contractor visits to essential services. See *BOP Implementing Modified Operations*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 2, 2020). Prisoner movement between facilities has been "suspended with limited exceptions." Id. Movement within facilities is restricted as well, with exceptions for mental health and medical treatment; certain programs and services; and access to commissary, laundry, showers, and telephones. See id. The BOP has also reduced its overall prison

---

[6] The government indicates that one staff member at FCI Allenwood Low tested positive for the virus but has since recovered. (See Doc. 75 at 9). The BOP does report one recovered staff member each at FCI Allenwood Medium and at the Allenwood United States Penitentiary, see *COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (select "Full breakdown and additional details") (last updated July 1, 2020, 3:00 p.m.), but the BOP has not reported a single positive test result among staff (or prisoners) at FCI Allenwood Low.

population by ramping up exercise of its authority under 18 U.S.C. § 3624(c)(2)—recently expanded by the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (2020)—to release certain vulnerable prisoners to home confinement. See *COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/. The BOP reports that it has increased use of home confinement by 162%, releasing an additional 4,617 prisoners in the past three months. Id.

There is also no reason to believe that the BOP cannot adequately treat Yanney's medical conditions. The medical records submitted by appointed counsel reflect that Yanney is seen regularly by prison medical staff, that his hypertension has been managed by diet and exercise, and that he has made significant strides toward his weight loss goals.[7] (See generally Doc. 73). Yanney experienced a work-related injury in the fall of 2019, (see id. at 19), and the BOP appears to be treating

---

[7] Indeed, it is not entirely clear from the medical records whether Yanney would still qualify as at-risk under the CDC's COVID-19 obesity guidance. Yanney certainly has a history of morbid obesity. (See Doc. 73 at 4, 24). But by October 2019—the most recent medical documentation available to us—Yanney had made impressive headway toward his weight loss objectives and reported having lost over 140 pounds. (See id. at 19). During that visit, Yanney's weight was recorded as 225 pounds and his height as 72 inches. (See id. at 20). Those measurements produce a body mass index of 30.51. See *Healthy Weight: About Adult BMI*, Centers for Disease Control and Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html#Interpreted (last visited July 2, 2020) (follow instructions for calculating body mass index); see also *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last reviewed June 25, 2020) (defining obesity for purposes of COVID-19 risk assessment as a body mass index of 30 or higher). We have assumed for purposes of this motion that Yanney's body mass index remains at 30.51 today and qualifies him as potentially being at increased risk under the CDC's guidance.

him appropriately for that injury, (see id. at 18 (reviewing MRI of lumbar spine and referring for further evaluation and treatment)).

The information available to the court establishes that Yanney's medical conditions are well controlled, that there presently is not a strong likelihood that he will be exposed to the COVID-19 virus at FCI Allenwood Low, and that the BOP is working diligently to prevent such exposure from happening. On these facts, we cannot conclude that the possibility that the COVID-19 virus *might* reach FCI Allenwood Low—whether on its own or in combination with Yanney's medical conditions—is an "extraordinary and compelling" reason for release.

### B.     Section 3553(a) Factors

Even if we were to agree that extraordinary and compelling circumstances exist, our analysis must still be informed by the Section 3553(a) factors.[8] See 18 U.S.C. § 3582(c)(1)(A). Yanney was ordered to self-surrender on May 24, 2017, (see Doc. 64), and, accounting for good time, has just under 14 months remaining on his 60-month sentence. We certainly commend Yanney's efforts at rehabilitation while

---

[8] The Section 3553(a) factors are (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct; . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available"; (4) the kinds of sentence and sentencing range recommended by the United States Sentencing Guidelines; (5) pertinent policy statements issued by the United States Sentencing Commission; (6) "the need to avoid unwarranted sentencing disparities" among similarly situated defendants; and (7) the need for restitution. 18 U.S.C. § 3553(a).

incarcerated, and we hope, as counsel does, that these efforts will serve Yanney well when he is eventually released from prison. (See Doc. 70-3 (outlining programming completed to date)). But the fact remains that Yanney's offense was a serious one, involving dangerous controlled substances and multiple firearms, and his sentence already reflects a downward variance to the statutory mandatory minimum term. On balance, the Section 3553(a) factors support leaving Yanney's existing sentence intact.

### III.  Conclusion

We are not unsympathetic to Yanney's concern—or to any prisoner's concern—that the COVID-19 virus may reach the institution where he is housed. But that concern does not alone supply an "extraordinary and compelling" reason for a sentence reduction that would have the effect of reducing Yanney's prison term by more than a year. Nor does it counterbalance the aggravating Section 3553(a) factors or the fact that Yanney's sentence already sits at the statutory mandatory minimum.

For all of these reasons, the court will deny Yanney's motion (Doc. 68) for compassionate release and reduction of sentence under 18 U.S.C. § 3582(c)(1)(A)(i). Mindful of the rapidly evolving nature of the COVID-19 pandemic and the potential for hotspot outbreaks, our denial will be without prejudice to Yanney's ability to

refile the motion if, for example, the COVID-19 virus is detected within FCI Allenwood Low.  An appropriate order shall issue.

/S/ Christopher C. Conner<br>
Christopher C. Conner<br>
United States District Judge<br>
Middle District of Pennsylvania

Dated:   July 2, 2020